UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**KELVIN NOLEN**,

                   Plaintiff,

v.

**STEVEN FORD**,

                   Defendant.

_____/

## COMPLAINT

_____/s/ *Trevor B. Garrison*_____
There is no other pending or resolved civil action arising out of the same transaction or occurrence alleged in this Complaint.

NOW COMES Plaintiff, KELVIN NOLEN, by and through his attorneys, TREVOR B. GARRISON and MICHAEL R. DEZSI, and for his Complaint against the above-named Defendant, states:

## INTRODUCTION

1.     This is a cause of action brought under 42 U.S.C. § 1983, 42 U.S.C. § 1988, and the Fourth and Fourteenth Amendments to the United States Constitution for the wrongful conviction of Plaintiff Kelvin Nolen.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

3.      The amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, excluding interest and costs.

4.      This Court has personal jurisdiction over the named Defendant because he resides in the State of Michigan or does systematic and continuous business in Michigan.

5.      This Court has supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367(a) because it is so related to the other claims in the action such that they form part of the same case or controversy.

6.      Venue lies in the Eastern District of Michigan, Southern Division, pursuant to 28 U.S.C. § 1391(b) because the events that support Plaintiff's allegations occurred in this district and because the Defendant resides in this district.

## THE PARTIES

7.      At all relevant times, Plaintiff Kelvin Nolen was a United States Citizen and a resident of Wayne County, State of Michigan.

8.      At all relevant times, Defendant Steven Ford was a United States Citizen and a resident of Wayne County, State of Michigan. He was employed as a

homicide detective by the City of Detroit, acting within the scope of his employment and under color of law during the period in question.

## FACTUAL ALLEGATIONS

### A.    Background

9.      On November 4, 2014, Mohamed Zokari was shot and killed while working his regular shift at a gas station in the City of Detroit.

10.    Surveillance footage from that morning showed a man in a black hooded sweatshirt arriving at the gas station around 6:00 am.

11.    Audio recordings captured the ten gunshots that killed Zokari.

12.    Only the perpetrator and the victim were in the store when Zokari was shot. No one witnessed the murder.

13.    The perpetrator left no physical evidence, and the murder weapon was never recovered.

14.    None of the surveillance footage captured a clear image of the perpetrator's face, as his hooded sweatshirt largely obscured it.

15.    Defendant Steven Ford, a homicide investigator in Detroit, initially focused his investigation on other suspects, but six months after the murder, he turned his attention to Plaintiff Kelvin Nolen.

### B.    The fabricated identification of Mr. Nolen and finding of probable cause

16.    In April 2015, Ford spoke with Nolen's estranged sister, Kenyatta

3

Jones-Hunt. Ford told her that he was investigating a breaking and entering incident at her home from 2012, which Jones-Hunt believed Nolen had committed. In truth, Ford was investigating Nolen for the Zokari murder.

17.    Ford showed Jones-Hunt surveillance footage and played an audio recording from the gas station on the morning of the murder, and pressed Jones-Hunt to identify her brother as the perpetrator.

18.    After watching the video, Jones-Hunt told Ford that the perpetrator was not her brother. In fact, she believed the person in the video might have been an acquaintance, Darryl Dobbs, who matched the perpetrator's description.

19.    Ford omitted from his police narrative reports that Jones-Hunt identified someone other than her brother as the potential perpetrator.

20.    Darryl Dobbs was never mentioned again.

21.    Initially, Jones-Hunt was adamant that the perpetrator was not her brother, repeatedly telling Ford that the shooter appeared taller. She believed this because of how the perpetrator's height compared to the countertops.

22.    However, Ford informed Jones-Hunt that he had visited the gas station and falsely claimed that the counters were "unusually low." They discussed the countertop height at length.

23.    In truth, the countertops in the gas station were standard size, as Ford very well knew.

4

24.    Ford continued to provide Jones-Hunt with false information in an effort to convince her that Nolen had shot Zokari.

25.    For example, Ford told Jones-Hunt that Nolen's phone records "placed him at the gas station" at the time of the murder. In truth, the phone records placed him elsewhere.

26.    Ford continued to deceive Jones-Hunt into identifying her brother as the individual depicted in the video and audio recordings. He told Jones-Hunt that Nolen was the murderer, despite knowing that Nolen had alibi witnesses and was in a different location at the time of the shooting.

27.    Jones-Hunt spent several hours reviewing the footage with Ford, speculating on whether or not Nolen *could be* the shooter.

28.    Ford then wrote a statement that Jones-Hunt signed, indicating that the perpetrator *was* her brother.

29.    Based on this "identification" and the false information provided by Ford, Nolen was charged with first-degree murder and related offenses on May 11, 2015.

30.    On May 26, 2015, a probable cause hearing was held in the 36th district court.

31.    During the hearing, Jones-Hunt testified and the audio recording was played for her.

32.    When the prosecutor asked if she recognized the voice on the recording, Jones-Hunt testified, "the voice could be somewhat similar to Kelvin's but I'm not a hundred percent sure."

33.    The prosecutor then "impeached" Jones-Hunt by referencing the statement written by Ford, in which she "identified" the voice as Nolen's.

34.    The prosecutor then asked Jones-Hunt if she could identify the person in the footage. Jones-Hunt answered in the negative. She further explained:

> Q:    With the physical attributes does that help you make an identification of te [sic] the person was on the video?
>
> A:    I'll have to say it does not, simply because the imagine [sic] was not clear. I expressed that to you as well as detective Ford and my investigative subpoena with you. I expressed the height and facial features were also not clear that just from the nose to the chin portion.

35.    The prosecutor again "impeached" Jones-Hunt by referencing the statement written by Ford, in which she "identified" the person in the footage as Nolen.

36.    In this context, the examining magistrate found probable cause, leading to Nolen being bound over to the circuit court for trial.

37.    On July 20, 2015, Nolen filed a pre-trial motion to quash the charges.

38.    After reviewing Nolen's motion, the transcript of the probable cause hearing, and Jones-Hunt's equivocal testimony, Judge Vonda Evans dismissed all

charges against Nolen for lack of probable cause on July 31, 2015.

39. However, within an hour of Judge Evans' dismissal, Ford and the assistant prosecuting attorney immediately reauthorized charges against Nolen.

40. On August 27, 2015, an examining magistrate at the 36th district court again found probable cause and bound Nolen over for trial. Nolen filed another motion to quash the charges shortly thereafter.

41. Upon reviewing and ruling on the motion, Judge Evans described the case as "very circumstantial." In denying this motion, Judge Evans reasoned, in part:

> And, basically, the—what the Court found to be the crucial evidence in this particular matter was the testimony of the sister, of the defendant's sister, Ms. Kenyatta Jones.

42. Trial commenced on February 16, 2016.

43. Despite having alibi witnesses and being in a different location at the time of the shooting, Nolen was found guilty by a jury on February 22, 2016, of first-degree murder and related offenses.

44. Nolen's conviction was based on Jones-Hunt's identification of her brother, which was influenced by false information fabricated by Ford.

45. On March 15, 2016, Nolen was sentenced to life in prison without the possibility of parole.

**C.    Photogrammetry    analysis    confirms    that    the perpetrator was too tall to be Mr. Nolen**.

46.    In 2018, Nolen submitted applications to the Wayne County Conviction Integrity Unit (CIU) and the Michigan Innocence Clinic (MIC) seeking to vacate his convictions and sentences.

47.    In 2019, the MIC retained two photogrammetry experts, Dr. David Fouhey and Dr. Eugene Levin, to analyze the perpetrator's height using the surveillance footage and compare it to known measurements of other individuals and objects in the gas station.

48.    After reviewing the surveillance footage and using known measurements of the door, countertop, and three other individuals inside the store, Dr. Fouhey determined the perpetrator's height to be 5'9", with a standard deviation of 0.7".

49.    Dr. Levin performed a perspective geometry measurement of the perpetrator's height based on the known countertop height visible in the footage to reach an estimation of around 6'0". A couple of months later, Dr. Levin conducted further analysis factoring in the known measurements of three other individuals who were at the gas station. Based on the referenced objects and the heights of these individuals, Dr. Levin came to his final measurement of 5'10" plus or minus two inches.

50.    The experts concluded that the actual perpetrator was three to four

inches taller than Nolen.

51.     Nolen is only 5'6", while Mr. Waseem Saleh, an eyewitness who testified at trial, estimated the perpetrator to be 6'0".

52.     Additionally, in 2020, the CIU and the MIC located a new eyewitness, Dekenera Leggett.

53.     Surveillance video from that day shows Leggett inside the gas station at 6:32 am, in close proximity to the perpetrator.

54.     Leggett has affirmed that the perpetrator was not Nolen, whom she would have recognized because Nolen was a childhood friend of hers and they had grown up together.

55.     Leggett did not come forward at trial because she believed the actual perpetrator, whom she didn't know, was still at large and she was afraid that he would come after her if she testified.

56.     After the investigation concluded, the Wayne County Prosecutor's Office acknowledged that there was substantial reason to believe that the outcome would have been different if this evidence had been available at the time of Nolen's trial. By stipulation and agreement, the Honorable Bradley Cobb vacated Nolen's convictions and dismissed his case without prejudice.

57.     On December 19, 2022, Nolen was released from custody.

58.     As a result of Ford's actions and inactions, Nolen was wrongfully

incarcerated in jail and prison from May 11, 2015, to December 19, 2022, or 7 years, 7 months, and 9 days.

59.   Ford's misconduct was a direct and proximate cause of Nolen's injuries and damages, including:

a.   Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over 7 years;

b.   Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charged with murder, facing a sentence of life in prison without the possibility of parole; and being wrongfully convicted of crimes the Defendant knew he did not commit;

c.   Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, anxiety, depression, and other symptoms;

d.   Fright, shock, indignity, humiliation, outrage, and embarrassment of being wrongfully charged and imprisoned for murder;

e.   Loss of enjoyment of daily activities;

f.   Not being able to attend the funerals of several family members and loss of relationships;

g.   Physical injuries suffered in prison;

h.   Inability to pursue romantic relationships and raise a family;

i.     Loss of employment opportunities, past income, and future earning capacity;

j.     Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, social relations, skill building, recreational activities, hobbies, and personal expression;

k.     Many of Nolen's injuries and damages are likely to be permanent; and,

l.     Other damages which may be revealed through discovery.

## COUNT I

### Unduly Suggestive Witness Identification Procedures

### In Violation of the Sixth and Fourteenth Amendments, Cognizable Under 42 U.S.C. § 1983

60.    Plaintiff restates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

61.    At all times, Nolen had constitutional rights of due process, guaranteed by the Fourteenth Amendment, and to a fair trial, guaranteed by the Sixth Amendment, to be free from police officers employing unduly suggestive and unnecessary witness identification procedures to manufacture identification of a suspect in a crime.

11

62.    Ford designed the illegal witness identification procedure to increase the chance of a false identification to manufacture probable cause for an arrest and prosecution.

63.    Ford's witness identification procedure violated Nolen's right to due process and a fair trial and resulted in Nolen not receiving a fair trial.

64.    Nolen's right to be free from an unduly suggestive and unnecessary identification was clearly established long before 2014. *Moore v. Illinois*, 434 U.S. 220, 227; 98 S.Ct. 458 (1977) ("Due process protects criminal defendants against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures.").

## COUNT II

### *Brady* Violation

**In Violation of the Fourteenth Amendment,
Cognizable Under 42 U.S.C. § 1983**

65.    Plaintiff restates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

66.    The Due Process Clause of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

67.    Suppression of material evidence favorable to the accused violates

due process, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland,* 373 U.S. 83, S. Ct. 1194 (1963).

68.    At all times relevant, Ford withheld exculpatory or impeachment evidence, including, but not limited to, Jones-Hunt's identification of Darryl Dobbs as the perpetrator and the fact that Dobbs matched the description of the perpetrator.

69.    As set forth above, Ford knowingly violated his duty to disclose to prosecutors all material evidence and its exculpatory and impeachment value was apparent.

70.    The material identified above was favorable to Nolen because it was exculpatory or impeaching, and Ford suppressed it.

71.    Ford willfully and intentionally suppressed Jones-Hunt's identification of Dobbs, and prejudice ensued because there is a reasonable probability that the suppressed evidence would have resulted in no charges being brought or produced a different verdict.

72.    The *Brady* violations committed by Ford resulted in Nolen not receiving a fair trial, described as a trial resulting in a verdict worthy of confidence.

73.    Had Ford disclosed the *Brady* material, there would have been no arrest, much less a conviction. A re-trial that included the *Brady* evidence would

have resulted in a directed verdict or acquittal.

74.    The *Brady* evidence referenced above would have been apparent to any reasonable officer acting in good faith.

75.    Nolen's right to be provided with material exculpatory and impeachment evidence was clearly established long before Nolen was investigated and arrested. *Jackson v. City of Cleveland*, 925 F.3d 793, 823 (6th Cir. 2019) (holding that in 1975, *Brady*-derived claims against police officers were clearly established).

## COUNT III

### Fabrication of Evidence

**In Violation of the Fourth and Fourteenth Amendments,
Cognizable Under 42 U.S.C. § 1983**

76.    Plaintiff restates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

77.    At all times, Nolen had a constitutional right, secured by the Fourth and Fourteenth Amendments, not to be seized and deprived of liberty because of the fabrication of evidence by a government officer acting in an investigative capacity. *See Jackson v. City of Cleveland*, 925 F.3d 793, 816 (6th Cir. 2019) (citing *Halsey v. Pfeiffer*, 750 F.3d 273, 294 n.19 (3d Cir. 2014)) ("[F]abricated evidence that 'is used as the basis for a criminal charge' can form the basis for a §1983 claim because, absent that evidence, there would have been no jury.").

78.     The Due Process Clause of the Fourteenth Amendment is violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury. *Gregory v. Louisville*, 444 F.3d 725, 737 (6th Cir. 2006).

79.     Ford deliberately and knowingly fabricated evidence to manufacture probable cause for an arrest warrant and to later secure Nolen's convictions. His fabrication involved falsely informing Jones-Hunt that the countertops were unusually low, leading her to identify her brother as the perpetrator, even though he knew Nolen was too short to match the perpetrator's description.

80.     Ford further fabricated evidence by falsely claiming that Nolen's phone records "placed him at the gas station" at the time of the murder, even though he knew that Nolen was nowhere near the scene when the crime occurred.

81.     Ford further fabricated evidence by way of his unduly suggestive and unnecessary identification procedure with Jones-Hunt as previously described.

82.     Jones-Hunt's preliminary examination and trial testimony were not impeached by Nolen's defense attorney because Ford concealed his deception in persuading her to identify her brother on the surveillance footage. Jones-Hunt's trial testimony placed Nolen at the scene of the crime and significantly influenced the jury's decision, as it was the only direct evidence of Nolen's involvement in the crime.

83.     Ford knowingly fabricated the above-referenced evidence and a reasonable likelihood exists that the false evidence would have affected the decision of the jury.

84.     Ford deliberately fabricated the above-referenced evidence to criminally charge, arrest, prosecute, detain, and convict Nolen.

85.     Ford used investigative techniques so coercive and abusive that she knew, or was deliberately indifferent to, whether those techniques would yield false information used to criminally charge, arrest, prosecute, detain, and convict Nolen.

86.     Nolen's constitutional right to be free from arrest and prosecution based upon fabrication of evidence by a police officer acting in a governmental capacity to manufacture probable cause for an arrest was clearly established before 2014. *Jackson v. City of Cleveland*, 925 F.3d 793, 825 (6th Cir. 2019) (fabrication of evidence claim clearly established in 1975).

## COUNT IV

### Wrongful Institution of Legal Process – Malicious Prosecution

**In Violation of the Fourth Amendment,
Cognizable Under 42 U.S.C. § 1983**

87.     Plaintiff restates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

16

88.     Nolen had a constitutional right, guaranteed by the Fourth Amendment, to be free of illegal seizure and detention without probable cause, based on false statements and/or material omissions that were knowingly or recklessly made to manufacture probable cause.

89.     As a homicide investigator, Ford had a duty to make truthful statements to the prosecutor and district court judge to establish probable cause for an arrest warrant.

90.     Ford influenced Nolen's criminal prosecution by deliberately and knowingly supplying false information and omitting material information, as set forth above, which showed a reckless disregard for the truth in requesting an arrest warrant and swearing to facts in support of probable cause, which was material to a finding of probable cause.

91.     Through the false statements and material omissions identified above, and by concocting the false narrative that Nolen was the perpetrator, Ford caused Nolen to be falsely arrested, maliciously prosecuted, convicted, and incarcerated, in violation of his constitutional rights.

92.     But for Ford's fabrication of evidence, knowingly false statements and material omissions, probable cause would have been lacking; such conduct constitutes a claim of federal "malicious prosecution" under the Fourth Amendment. *Mills v. Barnard*, 869 F.3d 472, 480 (6th Cir. 2017) ("The

prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person."); s*ee also Franks v. Delaware*, 438 U.S. 154; 98 S. Ct. 267 (1978).

93.   Nolen received a favorable termination of his criminal case when criminal charges were dismissed on December 19, 2022.

94.   Nolen's continued detention without probable cause based upon fabrication of evidence and false statements or material omissions by a government officer acting in an investigative capacity to manufacture probable cause was clearly established before 2014. *See Jackson v. City of Cleveland*, 925 F.3d 793 (6th Cir. 2019).

## COUNT V

### State Law Malicious Prosecution

95.   Plaintiff restates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

96.   The underlying criminal proceedings against Nolen ultimately terminated in his favor on December 19, 2022.

97.   Ford had a duty not to subject Nolen to unreasonable searches and seizures.

98.   Ford had a duty not to, for vexation or malicious purpose, cause Nolen to be arrested or in any way prosecuted without his consent or without probable

cause.

99.    Ford vexatiously or maliciously caused or continued Nolen's prosecution without his consent or probable cause.

100.    The criminal investigation and prosecution were undertaken without probable cause or good faith and with malice. The charges were not undertaken with the intention of bringing Nolen to justice for having committed the alleged murder. Instead, Ford knowingly fabricated evidence and used a coercive and illegal identification procedure to induce Jones-Hunt to identify Nolen as the perpetrator while making false statements and omitting material facts that were central to a finding of probable cause. Ford knew that absent the evidence set forth above, there was insufficient evidence against Nolen to support probable cause for arrest or continued detention.

101.    As a consequence of the criminal prosecution initiated and/or enabled and/or supported by Ford, Nolen suffered an unreasonable and unconstitutional seizure and deprivation of liberty and damages related to his unlawful confinement.

102.    As a direct and proximate result of Ford's misconduct, Nolen was charged and convicted of crimes he did not commit, causing him to suffer the special injuries and damages set forth above.

103.    Ford's conduct constitutes malicious prosecution pursuant to M.C.L. §

600.2907.


## <u>REQUEST FOR RELIEF</u>

Plaintiff Kelvin Nolen, by and through his counsel, prays for damages for his wrongful detention and imprisonment, in violation of the Constitution, as set forth above, including:

a.  Past and future compensatory damages;

b.  Punitive damages;

c.  Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988;

d.  All damages allowed under M.C.L. § 600.2907 and the common law of the State of Michigan, together with pre-judgment interest, costs and attorney fees allowed under state law;

e.  Such other and further relief as may be just and proper.


Respectfully submitted,

**GARRISON LAW, PC**

/s/ *Trevor B. Garrison*

Dated: August 13, 2024     TREVOR B. GARRISON (P69255)
Attorney for Plaintiff
1523 N. Main St.
Royal Oak, MI 48067
(248) 847-1000
tgarrison@garrison-law.com

**LAW OFFICE OF MICHAEL R. DEZSI, PLLC**

Michael R. Dezsi (P64530)
Attorney for Plaintiff
1523 N. Main St.
Royal Oak, MI 48067
(313) 757-8112
mdezsi@dezsilaw.com